Filed in Sarpy District Court
*** EFILED ***
Case Number: D59CI190000726
Transaction ID: 0008625448
Filing Date: 05/06/2019 03:03:31 PM CDT

IN THE DISTRICT COURT OF SARPY COUNTY NEBRASKA

| | | |
|---|---|---|
| ABIGAIL FLETCHER, | ) | Case No.: CI 19-726 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **AMENDED COMPLAINT AND** |
| vs. | ) | **JURY DEMAND** |
| | ) | |
| LOYAL SOURCE GOVERNMENT | ) | |
| SERVICES, L.L.C. | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW Plaintiff, Abigail Fletcher, for her cause of action against Defendant, Loyal

Source Government Services, hereby states the following.

## INTRODUCTION

1)    This is an action under Title VII of the Civil Rights Act of 1964 and the Nebraska

Fair Employment Practice Act challenging Defendant's unlawful sexual harassment, discrimination

and retaliation against Plaintiff.

## JURISDICTION AND VENUE

2)    Plaintiff Abigail Fletcher ("Abigail") is a resident of Douglas County, Omaha,

Nebraska.

3)    Defendant Loyal Source Government Services, L.L.C. ("Loyal Source") is a Florida

limited liability company with its principal office located at 12612 Challenger Parkway, Orlando,

Orange County, Florida 32826, doing business in Bellevue, Sarpy County, Nebraska.

4)    At all relevant times, Loyal Source has employed at least fifteen (15) employees.

5)    This court has original jurisdiction over these claims pursuant to Neb. Rev. Stat.

Section 24-302.

6)    Venue is proper in this court pursuant to Neb. Rev. Stat. Section 25-403.02.

1

## PROCEDURAL REQUIREMENTS

7)       On or about April 21, 2018, within 300 days of the acts which she complains, Abigail filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and concurrently filed her charge with the Nebraska Equal Opportunity Commission.

8)       On February 8, 2019, within 90 days of filing her original complaint, Abigail received her Notice of Right to sue from the EEOC.

9)       Pursuant to Neb. Rev. Stat. 48-1119(4), Plaintiff has satisfied all procedural requirements necessary to initiate this action.

## FACTUAL BACKGROUND

10)      In or about March 2017, Abigail was hired by Louisville Electronics ("Louisville"), as a wire puller.

11)      Louisville and Loyal Source were joint employers on the worksite. Both Louisville and Loyal Source worked jointly for a project for the United States Government. The other contractors on the worksite were Tyco, Johnson Controls ("JCI"), Kiewit Corporation, and Phelps. The worksite consisted of a large-building facility with two basements and four upper floors, and twelve adjacent trailers. One of the twelve trailers was for Louisville, Tyco, JCI, and Loyal Source. One of the other trailers was used by Kiewit and Phelps. Tyco, JCI, Louisville, Loyal Source, Kiewit, and Phelps were all subcontractors on the work site.

12)      Louisville and Loyal Source both worked in the same location. The jobs at Louisville and Loyal Source required the same skills. Louisville and Loyal Source intended to work together on the project until it was complete which could take years. Loyal Source employees directed Louisville employees and assigned them tasks. Both Louisville and Loyal Source controlled Abigail's schedule and her work assignments.

2

13) The chain of command at the worksite started with the United States Air Force, then the Army Corps of Engineers, then Kiewit and Phelps, then JCI, then Tyco, which is a branch of JCI, and a few other subcontractors, finally at the last line in the chain of command was Loyal Source and Louisville.

14) Project Manager for Loyal Source Brian Drap ("Drap") was Abigail's immediate supervisor. Abigail reported to Drap. Anything that Drap told Abigail to do, she was required to do. Abigail worked primarily with Drap instead of her team at Louisville. Drap also had the ability to hire and fire any Loyal Source employee.

15) Abigail was one of a few female employees at the work site. Throughout her employment, Abigail was sexually harassed by Drap and her male co-workers.

16) One of the first things Drap said to Abigail was, "How does it feel to spend your money for four years getting a degree in Theatre and now you're pulling wires at a construction site?"

17) Abigail's other immediate supervisor, David Christensen ("Christensen"), a foreman for Louisville, scolded Drap for his comment and said to him, "Brian, dude, come on, man."

18) The basement halls in the main building where Abigail worked had many portable urinals with a single door that was chest/shoulder height. Most men did not make use of the door.

19) During Abigail's first week on site, she turned a corner and a man had simultaneously turned around with an open urinal door without having pulled his pants up fully. She had many incidents where male employees exposed their genitalia to her because of the location of the urinals.

20) Abigail complained to her co-workers over the next two weeks about the urinal issue. At various points in her employment, Abigail specifically complained to Leo Zuniga ("Zuniga"), Michael Larsen ("Larsen"), and Christensen.

3

21) In her third week, Abigail made a comment to Larsen that she had seen male genitals almost every day and she was tired of it. Abigail said it disturbed and sickened her to see male genitals almost every day.

22) At the end of her third week on site, approximately the end of March, Abigail went to lunch with Christensen. Abigail told Christensen that she was "tired of seeing penises all the time."

23) Christensen asked if Abigail was serious and asked when she had seen penises at work and where. Abigail told him it happened often, nearly daily, and she mentioned she was surprised that he had not seen any.

24) Christensen admitted that the urinal doors were often left unused and that he would not be surprised if men knew that Abigail was coming and turned around early on purpose so they would flash her.

25) Instead of eating lunch, Christensen led Abigail to Drap's office. Christensen explained the situation to Drap and suggested that all three of them walk over to the trailer to discuss the urinal issue with a human resources representative from Kiewit.

26) Drap agreed to accompany Christensen and Abigail over to the trailer.

27) As they shut the door and walked towards the trailer, Drap smiled at Abigail and asked, "Did you like any of them? Like, were any of them good?"

28) Christensen shook his head and sighed, "Brian, dude, you can't say stuff like that."

29) Abigail said to Drap, "Excuse you?" Drap only laughed in response.

30) Abigail was led to the office of Kiewit Human Resource Representative Rob Spiller ("Spiller"). Christensen explained the situation to Spiller. He said that the men on the site were exposing themselves to Abigail. Abigail confirmed what Christensen said.

4

31)     Spiller asked Abigail if she wanted to file anything formal. Abigail told him that she just wanted it to stop so she could work.

32)     Abigail trained Tyler Stephen ("Stephen") when he was hired by Louisville. Stephen was promoted to technician after he was only employed on the site for approximately a month.

33)     Abigail complained to Christiansen that Stephen was promoted over her when she trained him.

34)     Abigail also trained Leo Zuniga ("Zuniga") when he was hired by Louisville. In May 2017, he was also was promoted to technician over Abigail. He only worked at the job site for approximately a month before he was promoted.

35)     When Zuniga was promoted, Christiansen called Abigail and apologized that Zuniga was promoted over her.

36)     Throughout Abigail's employment, Drap would make off-handed comments and inappropriate statements to Abigail. As Abigail's employment at the worksite continued, the comments Drap made became more frequent and more inappropriate until they became almost a daily occurrence.

37)     Drap would make "that's what she said" jokes and inappropriate responses to other benign statements Abigail made. On one occasion, Abigail said, "I need a shower, I'm dirty." Drap replied to that comment, "Yeah you are" in a suggestive manner.

38)     In the beginning of July 2017, Abigail was promoted to Technician.

39)     On or about July 14, 2017, Christensen was terminated from the work site. He was replaced by Ethan Dugan ("Dugan").

40)     On July 27, 2017, Drap went on vacation.

5

41) At the beginning of Drap's vacation, Dugan confronted Abigail and accused her of telling the general public that she was in charge and would be replacing Drap. Dugan said he heard this from the Kiewit trailer and told Abigail she needed to stop saying those things.

42) Dugan also made Abigail call Drap on speaker-phone so Dugan, Drap, and Abigail could all talk about it and get on the same page.

43) During the phone call, Drap asked Abigail was what going on, so he could get her perspective. Abigail told Drap that he knew as much as she did and the only conversations she had about Drap to anyone, in the short time between the start of his vacation and the conference call, were with him and other employees as he informed other employees that if they needed to tell him something Abigail was to take notes and take message for him from employees of Kiewit and Phelps, should they need to have him know something in his absence.

44) After the telephone conference with Drap, Abigail went to the Kiewit trailer and spoke to Alex Irving-Smith ("Irving-Smith"), and the other person in Irving-Smith's cubicle. Both of them were baffled and did not know why Dugan has accused Abigail of claiming she was in charge.

45) On August 3, 2017, Drap returned from his vacation.

46) On August 4, 2017, at approximately 2:00 p.m., Abigail went to update Drap on what had happened while he was on vacation.

47) Drap was wearing sunglasses and smoking. Abigail had her arms crossed over her chest as she approached him. Drap said to Abigail, "Don't cross your arms like that." Abigail said, "I'm not upset, it's just comfortable because it stretches my back out." Drap responded, "But then I can't look at your tits when you are talking to me." Abigail was shocked and confused, so she said, "What?" Abigail paused for a moment to digest that her supervisor had just made a comment about her breasts to her. Then Abigail told Drap he could not say things like that.

6

48)     Drap tried to laugh off the comment. He waved his hands and said, "It's not my fault!" Abigail told him he needed to keep comments like that in his head, and he could not say that. Drap repeated again, "It's not my fault." Abigail told him it was his fault, and he needed to keep it to himself. Drap said, "Maybe it's your hair. I have a thing for redheads." Abigail asked him to stop and said he was lucky she had a sense of humor because he would be fired from anywhere else if he said things like what he said to her. Drap said he would not be fired and said, "I would just deny it."

49)     Abigail was flustered, but she quickly told Drap everything she could about what had happened in his absence.

50)     Drap looked at his watch and said, "It's 2:08. You have a couple minutes. Just hang out here." Abigail responded by saying she was going to go to the bathroom and look some stuff up on the computer before her meeting.

51)     That same day, Abigail walked in to the new Loyal Source Secretary Denise Otero's ("Otero") office and shut the door behind her. Abigail asked Otero for her notepad and wrote down that a supervisor had asked her to unfold her arms because he could not look at her tits while speaking to her, that the conversation went downhill from there, and that he had joked about denying statements. Abigail then wrote the question of what to do.

52)     Otero immediately told Abigail it was not okay. Otero told Abigail she needed to tell someone immediately and if she was not comfortable with it, Otero would tell someone higher up. Abigail asked Otero not to tell anyone because Abigail needed the job, and she was fearful of retaliation.

53)     Abigail went home and spoke to her mother about what had happened at work. Abigail's mother encouraged her to report the sexual harassment.

54)     That night at 5:25 p.m., Abigail called Randy Halderman ("Halderman"), the owner of Louisville. After only a brief introduction of the situation, Halderman stopped Abigail and instructed her to write a detailed email to him.

55)     At 6:11 p.m., while Abigail was composing an email to Halderman about the sexual harassment she experienced by Drap, she received a phone call from Drap on her cell phone. Abigail did not answer. Drap then messaged Abigail, "Please call me."

56)     Abigail texted Halderman to ask if he had spoken with Drap about their phone conversation. At 6:54 p.m., Halderman texted Abigail that he had not talked to Drap. Abigail thanked Halderman and said she would not be responding to Drap's texts or calls.

57)     Abigail sent the email to Halderman and to Kiewit's human resources department; it detailed the sexual harassment she experienced. Halderman informed Abigail that he would be involving two other parties: Amy Sage ("Sage"), a national employee at JCI, and Jon Meltzer ("Meltzer"), who is Drap's supervisor from Loyal Source.

58)     On Monday, August 7, 2017, Abigail did not attend work because she would have been forced to work in close proximity with Drap.

59)     Abigail requested updates from Halderman via email. She also asked for advice on how to proceed with work.

60)     Halderman informed Abigail that Sage would be flying into town to address several issues including Abigail's sexual harassment complaint. Halderman also informed Abigail that Sage had contacted JCI human resources and JCI human resources would be doing a full investigation into Abigail's sexual harassment complaint.

61)     On August 8, 2017, Abigail was contacted by Sage. Sage requested that Abigail meet with her in the afternoon. Abigail was given Meltzer's number from Halderman, so she could set up a phone meeting. When Abigail called Meltzer, he put her on hold and brought in a human

resources representative from Loyal Source. Meltzer and the human resources representative informed Abigail that Drap had been counseled regarding the sexual harassment policy.

62)   Abigail then met with Sage in one of the trailers on the worksite. She spoke to Abigail privately in a side office within the trailer. Abigail told Sage she was concerned because she had been inconvenienced and out of work, but Drap had not.

63)   Abigail informed Sage that she did not think Loyal Source was doing anything to rectify the hostile work environment and prevent further sexual harassment. Sage assured Abigail, after a long discussion, that if Loyal Source refused to take appropriate steps, she would. Sage encouraged Abigail to come up with a solution. Abigail said what she wanted was simply to not have to work near Drap.

64)   After her meeting with Sage, Abigail called Loyal Source. When no one answered her call, Abigail left a message with Meltzer to return her call.

65)   Meltzer called Abigail back with a handful of other people also on the line via speakerphone. Abigail told them she wanted to have Drap removed from his current physical position. They asked if there was a way to salvage a professional relationship between her and Drap. Abigail said there was not.

66)   Loyal Source refused to remove Drap.

67)   After a second phone call with Meltzer, Abigail sent an email to Sage, Halderman, and Spiller. In the email, Abigail said that she felt like she was being blamed instead of Drap. Abigail asked if Loyal Source was going to force her to contact an attorney.

68)   On Wednesday August 9, 2017, Halderman informed Abigail that she would be temporarily relocated to work alongside Greg Valentine ("Valentine"), a JCI employee. Abigail worked at this temporary location until August 11.

9

69)     On August 11, 2017, Abigail met with Halderman.  Halderman told Abigail that Drap had been fired from the project.  He said she could return to the work site on Monday and work alongside Otero in the office of the trailer.

70)     On August 14, 2017, Abigail met with the two new project managers that replaced Drap.  After Drap was removed from the work site, Abigail reported to Mike Norcott ("Norcott"), another Project Manager from Loyal Source.

71)     On August 22, 2017, Abigail heard a rumor that Halderman had lost his contract with JCI on the project and had not informed Louisville employees.

72)     While Abigail was in the trailer, Halderman came into the trailer on site and removed all of his belongings.

73)     James Robbins, a technician for Louisville, confirmed that Halderman left without any notice to his employees and that Loyal Source would be taking over the contract.

74)     On August 23, 2017, Louisville employees were informed that Loyal Source would be hiring selected Louisville's employees.  Loyal Source also informed the employees that it was looking to expand and perhaps even add a second shift.

75)     Towards the end of the work day, Abigail asked Norcott if she could speak to him privately.  Norcott said in front of Otero and Rick Brokofsky ("Brokofsky"), an employee of JCI, that he could not speak to Abigail unless a third party was present.  Abigail asked why, and he responded, "That's how I roll."

76)     Abigail asked, embarrassingly, in front of both Otero and Brokofsky, if Norcott knew the status of her job security.  Norcott told Abigail that he did not know, but that she was being considered for a position.  Even though Norcott claimed Abigail was being considered, Norcott also said he had already offered Abigail's position to someone else that seemed more qualified, and whether she would be hired by Loyal Source depended on if they said yes or no.

10

77)   Throughout the rest of the day, many Louisville employees met privately with Dugan.

78)   Abigail believed at this point Dugan had already been hired by Loyal Source.

79)   Abigail spoke with several individuals who met with Dugan, and they informed her that they had been offered to stay on and continue working.

80)   Abigail was the only Louisville Electronics employee who Dugan did not request to meet with regarding continued employment.

81)   Loyal Source hired every single Louisville employee, but Abigail.  Loyal Source hired the following Louisville employees: Quionez Berry, Ethan Dugan, Jonathan Ehret, Coburn Greiner, William Hom, Logan Johnson, Kenneth Layton, Joshua Mlynarik, Reagan Roeder, Alexander Rohan, Charles Showalter, Michael Smedra, Tyler Steffan, Kori Sutton, Christian Tabor, Joseph Taft, Roy Winters, Jason Worden, Leonel Zuniga.

82)   Some of the employees Loyal Source hired were brand new employees, known to do less than stellar work, had just been recently caught not working on site, and/or were employees Abigail had trained when they were hired.

83)   After speaking with a few employees that were hired by Loyal Source, Abigail met with Norcott again.  Because he would not speak to Abigail privately, Abigail asked Zuniga , who had also been hired by Loyal Source, to accompany her.

84)   Otero offered to accompany Abigail, but Zuniga, Otero, and Abigail decided it would be best if only one person accompanied Abigail.

85)   Abigail asked Norcott why she was the only Louisville employee not hired for the position.  Abigail asked if Norcott was aware of her history on site.  Abigail also said that she trained two people that were hired and assisted in training three employees that were hired.  Abigail told Norcott that she wanted to know why she was not being offered a position by Loyal Source.

11

Norcott confirmed that Abigail was not in consideration for a position with Loyal Source. Abigail said "So you're denying my application?" and Norcott said "Yes," and asked her to leave.

86) After Louisville lost its contract, Loyal Source substantially continued the same business operations as Louisville.

87) Loyal Source worked at the same job site as Louisville and took over Louisville's operations.

88) Loyal Source transitioned Louisville's employees to its work force.

89) Loyal Source kept Louisville employers in the same job under the same working conditions, with the same supervisory personnel, machinery, equipment, production methods, and production goals and services.

90) Loyal Source is able to provide relief in this case.

## COUNT I
## VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
### (Discrimination)

91) Plaintiff repleads paragraph 1 to 90 as fully set forth herein.

92) Defendant at all times material was an "employer" as defined by the Nebraska Fair Employment Practice Act.

93) In the alternative, Loyal Source was a "successor in interest" to Louisville Electronics, and is therefore liable for Louisville's discrimination, harassment, and retaliation of Plaintiff.

94) In the alternative, at all times relevant, Loyal Source and Louisville Electronics were joint employers.

95) Plaintiff at all times material was an "employee" as defined by the Nebraska Fair Employment Practice Act.

12

96)    In the alternative, Plaintiff applied for a position with the defendant.

97)    Defendant discriminated against Plaintiff with respect to the terms and conditions of her employment on the basis of her sex in violation of the Nebraska Fair Employment Practice Act.

98)    Defendant, and/or its agents with Defendant's authority, discriminated against Plaintiff because of sex by both terminating her employment and failing to hire her.

99)    Plaintiff's sex was a motivating factor in Defendant's decision to terminate Plaintiff's employment and/or fail to hire her.

100)    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, embarrassment, lost enjoyment of life, and lost wage, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, punitive damages on behalf of the common schools fund, for interest as allowed by law, for attorney's fees, for the costs of this action, injunctive relief, and for such other relief as may be just in the

circumstances and consistent with the purpose of the Nebraska Fair Employment Practice Act.

## COUNT II
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### (Discrimination)

101)    Plaintiff repleads paragraph 1 to 105 as fully set forth herein.

102)    Defendant at all times material was an "employer" as defined by Title VII of the Civil Rights Act.

103)    In the alternative, Defendant was a "successor in interest" to Louisville Electronics, and is therefore liable for Louisville's discrimination, harassment, and retaliation of Plaintiff.

13

104)   In the alternative, at all times relevant, Louisville and Loyal Source were "joint employers."

105)   Plaintiff at all times material was an "employee" as defined by the Title VII of the Civil Rights Act.

106)   In the alternative, Plaintiff applied for a position with the Defendant.

107)   Defendant discriminated against Plaintiff with respect to the terms and conditions of her employment on the basis of her sex in violation of Title VII of the Civil Rights Act.

108)   Defendant, and/or its agents with Defendant's authority, discriminated against Plaintiff because of her sex by terminating her employment and/or failing to hire her.

109)   Plaintiff's sex was a motivating factor in Defendant's decision to terminate Plaintiff's employment and/or failing to hire her.

110)   As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, embarrassment, lost enjoyment of life, and lost wage, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for attorney's fees, for the costs of this action, for punitive damages, injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of the Title VII of the Civil Rights Act.

## COUNT III
## VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
### SEXUAL HARASSMENT
#### (Vicarious Liability)

111)   Plaintiff repleads paragraph 1 to 110 as fully set forth herein.

14

112) Brian Drap was a supervisor for Abigail Fletcher that had the ability to make a tangible employment action against Abigail.

113) Drap also had the ability to make influential recommendations regarding hiring, firing, and other tangible employment actions upon which Defendant would rely regarding Abigail's employment.

114) In Drap's daily supervisory role of Abigail he instructed her on her tasks and controlled her work environment.

115) Drap's harassment of Abigail can be attributed to Defendant by virtue of the doctrine of vicarious liability because said harassment led to a tangible employment action against her—termination and/or failure to hire.

116) Defendant discrimination against Plaintiff with respect to the terms and condition of her employment on the basis of her sex and subjected her to sexual harassment all in violation of the Nebraska Fair Employment Practice Act.

117) Plaintiff was subjected to unwelcome, sexually offensive conduct by Drap.

118) Such conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find her work environment to be hostile or abusive.

119) At the time such conduct occurred and as a result of such conduct, Plaintiff believe her work environment was hostile or abusive.

120) As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, embarrassment, lost enjoyment of life, and lost wage, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for

15

attorney's fees, for the costs of this action, for punitive damages on behalf of the common schools fund, injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practice Act.

## COUNT IV
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
## SEXUAL HARASSMENT
## (Vicarious Liability)

121)    Plaintiff repleads paragraph 1 to 120 as fully set forth herein.

122)    Brian Drap was a supervisor for Abigail Fletcher that had the ability to make a tangible employment action against Abigail.

123)    Drap also had the ability to make influential recommendations regarding hiring, firing, and other tangible employment actions upon which Defendant would rely regarding Abigail's employment.

124)    In Drap's daily supervisory role of Abigail he instructed her on her tasks and controlled her work environment.

125)    Drap's harassment of Abigail can be attributed to Defendant by virtue of the doctrine of vicarious liability because said harassment led to a tangible employment action against her—termination and/or failure to hire.

126)    Defendant discrimination against Plaintiff with respect to the terms and condition of her employment on the basis of her sex and subjected her to sexual harassment all in violation of Title VII of the Civil Rights Act.

127)    Plaintiff was subjected to unwelcome, sexually offensive conduct by Drap.

128)    Such conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find her work environment to be hostile or abusive.

129)    At the time such conduct occurred and as a result of such conduct, Plaintiff believe her work environment was hostile or abusive.

16

130)  As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, embarrassment, lost enjoyment of life, and lost wage, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for attorney's fees, for the costs of this action, for punitive damages, injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of the Title VII of the Civil Rights Act.

## COUNT V
## VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICE ACT
## SEXUAL HARASSMENT
### (Negligence)

131)  Plaintiff repleads paragraph 1 to 130 as fully set forth herein.

132)  Defendant discrimination against Plaintiff with respect to the terms and condition of her employment on the basis of her sex and subjected her to sexual harassment all in violation of the Nebraska Fair Employment Practice Act.

133)  Plaintiff was subjected to unwelcome, sexually offensive conduct her male co-workers.

134)  Such conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find her work environment to be hostile or abusive.

135)  At the time such conduct occurred and as a result of such conduct, Plaintiff believe her work environment was hostile or abusive.

136)  Defendant knew or should have known of the harassment.

137)  The harassment Abigail experienced was open and obvious.

17

138)    Defendant's were on notice of the harassment Abigail experienced both because it was open and obvious and because of Abigail's complaints of the harassment.

139)    Defendant acted negligently in creating, contributing to, or failing to stop the harassment by Abigail's male co-workers, as Defendant was on notice of the harassment.

140)    As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, embarrassment, lost enjoyment of life, and lost wage, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for attorney's fees, for the costs of this action, for punitive damages on behalf of the common schools fund, injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of the Nebraska Fair Employment Practice Act.

## COUNT VI
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
## SEXUAL HARASSMENT
## (Negligence)

141)    Plaintiff repleads paragraph 1 to 140 as fully set forth herein.

142)    Defendant discrimination against Plaintiff with respect to the terms and condition of her employment on the basis of her sex and subjected her to sexual harassment all in violation of Title VII of the Civil Rights Act.

143)    Plaintiff was subjected to unwelcome, sexually offensive conduct her male co-workers.

144)    Such conduct was sufficiently severe or pervasive that a reasonable person in Plaintiff's position would find her work environment to be hostile or abusive.

18

145) At the time such conduct occurred and as a result of such conduct, Plaintiff believe her work environment was hostile or abusive.

146) Defendant knew or should have known of the harassment.

147) The harassment Abigail experienced was open and obvious.

148) Defendant was on notice of the harassment Abigail experienced both because it was open and obvious and because of Abigail's complaints of the harassment.

149) Defendant acted negligently in creating, contributing to, or failing to stop the harassment by Abigail's male co-workers, as Defendant was on notice of the harassment.

150) As a result of Defendant's acts and omissions, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress, fear, anguish, humiliation, embarrassment, lost enjoyment of life, and lost wage, benefits, future earnings, and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, for attorney's fees, for the costs of this action, for punitive damages, injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of Title VII of the Civil Rights Act.

## COUNT VII
## VIOLATION OF THE NEBRASKA FAIR EMPLOYMENT PRACTICES ACT
### (Retaliation )

151) Plaintiff repleads paragraph 1 to 150 as fully set forth herein.

152) Plaintiff complained to Defendant about the sexual harassment, discrimination, and retaliation she experienced and otherwise opposed practices made unlawful by the Nebraska Fair Employment Practice Act.

19

153)    Defendant discriminated and retaliated against Plaintiff with respect to the terms and conditions of her employment on the basis of her opposition to an unlawful employment practice under the Nebraska Fair Employment Practice Act in violation of the Nebraska Fair Employment Practice Act.

154)    Defendant, and/or its agents with Defendant's authority, retaliated against Plaintiff because of her complaints and opposition to the harassment for her protected activity by both terminating her employment and failing to hire her.

155)    Plaintiff's protected activities were motivating factors in Defendant's retaliation against her.

156)    The actions taken by Defendant and/or its agents with Defendant's authority, in response to Plaintiff's complaints of harassment and discrimination and retaliation are material in that they would dissuade a reasonable individual from reporting harassment or discrimination.

157)    As a result of Defendant's acts and omission, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages; benefits; future earnings; and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, punitive damages on behalf of the common schools fund, for attorney's fees, for the costs of this action, injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of Nebraska Fair Employment Practice Act.

20

## COUNT VIII
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### (Retaliation )

158)   Plaintiff repleads paragraph 1 to 157 as fully set forth herein.

159)   Plaintiff complained to Defendant about the sexual harassment, discrimination, and retaliation she experienced and otherwise opposed practices made unlawful by Title VII of the Civil Rights Act.

160)   Defendant discriminated and retaliated against Plaintiff with respect to the terms and conditions of her employment on the basis of her opposition to an unlawful employment practice under the Civil Rights Act in violation of Title VII of the Civil Rights Act.

161)   Defendant, and/or its agents with Defendant's authority, retaliated against Plaintiff because of her complaints and opposition to the harassment for her protected activity by both terminating her employment and failing to hire her.

162)   Plaintiff's protected activities were motivating factors in Defendant's retaliation against her.

163)   Plaintiff's protected activity was a but-for factor in Defendant's retaliation against her.

164)   The actions taken by Defendant and/or its agents with Defendant's authority, in response to Plaintiff's complaints of harassment and discrimination and retaliation are material in that they would dissuade a reasonable individual from reporting harassment or discrimination.

165)   As a result of Defendant's acts and omission, Plaintiff has in the past and will in the future suffer damages including, but not limited to, mental and emotional distress; fear; anguish; humiliation; embarrassment; lost enjoyment of life; lost wages; benefits; future earnings; and other emoluments of employment.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages, for interest as allowed by law, punitive damages, for attorney's fees, for the costs of this action, injunctive relief, and for such other relief as may be just in the circumstances and consistent with the purpose of Title VII of the Civil Rights Act.

## JURY DEMAND

COMES NOW the Plaintiff, through her attorneys, and hereby requests a trial by jury, in Douglas County, Nebraska.

Dated this 6th day of May 2019.

ABIGAIL FLETCHER, Plaintiff

BY: _/s/ Stephanie Costello_

Kelly K. Brandon, #20734
Stephanie J. Costello, #26309
Fiedler Law Firm, P.L.C.
20615 Highway 370
Gretna, NE 68028
(402) 316-3060
(402) 513-6501 (facsimile)
kelly@employmentlawnebraska.com
stephanie@employmentlawnebraska.com
Attorneys for Plaintiff

22

# Certificate of Service

I hereby certify that on Monday, May 06, 2019 I provided a true and correct copy of the Amended Complaint to the following:

Loyal Source Government Services service method: No Service

Fletcher,Abigail, represented by Kelly K. Brandon (Bar Number: 20734) service method: Electronic Service to kelly@employmentlawnebraska.com

Signature: /s/ Stephanie Jeanne Costello (Bar Number: 26309)